IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**MICHAEL PRETE,** *Plaintiff*

**VS.** Case No._____________

**Mark Benjamin, Peter Neronha, Stephen Dambruch,**
**Susan Urso, Richard St. Sauveur, Jr., Cory Carpenter,**
**Gregg Catlow, David Walsh, Douglas Cerce Jr.,**
**Joseph Marcello, John Beausoleil, Michael McCoy,**
**Gary McDole, Brendan McDonald, Gavin O'Keefe,**
**Robert Squillante, Santander Bank, Timothy Wennes,**
**Brian Yoshida, Robert Bailey, Jeffrey Reilley,**
**Ann Pacheco, Michelle Jordan, John Doe, Jane Doe,**
**T. Michael Lawton, Michael Iannotti, Sean Kilduff,**
**John Tassoni Jr., Rachel Toppi, Michael Jacome,**
**Daniel J. Passacantilli, Lorraine Passacantilli,**
**Daniel Lagone Passacantilli and Susan Passacantilli as parents of Marti Passacantilli,**
**"Passacantilli Family 2012 Irrevocable Trust,"**
**Joseph Esposito, John Doe,** *Defendants*

## CASE INITIATING COMPLAINT

## BRIEF INTRODUCTION

Attorney Michael Prete (Plaintiff) ("Prete") had been contacting the U.S. Department of Labor regarding crimes being committed by FM Global ("FM") (a nearly 200-year-old (per FM's website) multi-billion-dollar RI-based international insurance company). Prete's family had lawsuits (e.g. numerous embezzlement counts) lined up against FM Global, entities contracted with, controlled by, etc. FM, etc., etc. Shortly after Prete's family declared (in a private communication with a private individual) that FM, etc. were "…facing historic lawsuit," the herein events unfolded.

In the last three (3) years from this filing (and ongoing), in addition to the bank frauds and countless mail and wire frauds committed in furtherance of the ongoing, unrelenting scheme to get rid of Prete, federal felony crimes have been committed (including, but not limited, forging

federal documents (by/at the direction of member(s) of the RI Attorney General's Office acting at the direction of RI AG Peter Neronha)) against Prete, Prete has been kidnapped twice (with a third attempt looming), Prete has been repeatedly and unrelentingly extorted (including, but not limited to, Prete having his law licenses in RI and Massachusetts weaponized against him and, ultimately, illegally stolen from him), holding Prete hostage in the corrupt government system (and, resultingly, forcing Prete to become a slave to illegal whims of individuals seeking to end Prete), etc., and even attempts of murdering Prete/facilitating Prete's death. The efforts are unrelentingly ongoing and the efforts are not stopping and will not stop until Prete is ended.

Disturbingly, the vast majority of the players of the RI-centered criminal enterprise executing the scheme are high-level government employees who span at least three different States/Jurisdictions.

For perspective, Prete's mom provided RI AG Peter Neronha (directly) (via e-mail) proof of FM's embezzlements, etc. against her. Neronha's Office (who directly received this proof) has done nothing. To date, RIAG refuses to even open a file on FM. **Yet, the State committed federal felony crimes to forge (A.K.A. counterfeit) documents in order to fraudulently, etc. go after Prete.** ETC.

Because of Prete's unique lifestyle, there are limited ways and times to make attempts on Prete. Consequently, there are repeated absurd, illogical efforts (to the point of committing mail fraud, wire fraud, etc.) to ensure Prete is forced to appear at set locations (prescheduled, etc. therefore knowing the specific dates AND times at whatever location they choose) to provide ongoing opportunities to end Prete.

After less exposing/documentary means to execute the scheme against Prete were unsuccessful, the criminal enterprise immediately moved to what they believed was a full proof way to end Prete.

After the Smithfield, RI Police Department's ("SPD") knowingly illegal arrest, illegal searches, sexual assaults, concealment of exculpatory evidence (to date), falsification of several documents, destruction of exculpatory evidence (documented), etc., etc., among other things, **RI COMMITTED FEDERAL FELONY CRIMES (FORGED DOCUMENTS (PROVEN VIA, EXAMPLE, U.S. SECRET SERVICE ("USSS"), ETC.)), ETC. TO DESTROY, ETC. PRETE.** *See* herein for copies of RI's forgeries and USSS proof (including publicly available proof) demonstrating RI's forgeries.

Not only are bedrock rules, Constitutional guarantees, laws, etc. repeatedly and intentionally violated (documented), **as repeatedly demonstrated UNDER NO CIRCUMSTANCES WILL THEY ALLOW, among other things, PRETE TO BE EXONERATED AND FREED FROM THEIR CLUTCHES.**

On 6/24/25, RI's Chief Disciplinary Counsel ("RICDC") Kerry Reilley Travers even signed a letter euphorically admitting such.

Despite Travers's (35-year veteran of RI's Disciplinary Office and FIVE YEARS as RICDC) 6/24/25 signed letter acknowledging her duty to investigate, admitting having been under such duty for AT LEAST A YEAR (As of 6/24/25. As of this filing, Travers has been under a duty to investigate for AT LEAST OVER TWO YEARS), etc., Travers's 6/24/25 signed letter specifically stated "…the disciplinary investigation will be **HELD OPEN** until [the RI Judiciary has finished Prete]." (Emphasis Added).

Per evidence obtained by Prete, instead of Travers conducting her SIMPLE, RI Supreme Court ORDERED investigation, Travers (the RI Government), etc. **CROSSED STATE LINES, RECRUITED THE MASSACHUSETTS GOVERNMENT, ETC. TO RETALIATE AGAINST PRETE FOR PRETE EXPOSING (WITH DOCUMENTED EVIDENCE) FEDERAL FELONY CRIMES, ETC.**

Given the ongoing nature of the criminal enterprise, this filing is effectively being submitted in emergency fashion. Prete incorporates by reference in their entirety all documents contained in (which obviously includes all referenced documents, etc. as well as any and all court session transcripts (both in audio and written form)) the RI Superior Court Case #P2-2023-3243A, Massachusetts Supreme Judicial Court Case #SJC-13871, U.S. District Court for RI Case #1:25-cv-00677, U.S. Supreme Court ("SCOTUS") Cases #24-614, 24-1000, 25-148/25-154, 25-1394 as well as any and all related/referenced cases.

## JURISDICTION/VENUE

Jurisdiction is granted under 28 USC §1331, 28 USC §1343(a)(3), 28 USC §1367.

The vast majority of the events giving rise to this case occurred (and continue to occur) in RI and the criminal enterprise is centered in RI.

## PARTIES

Plaintiff is a Narragansett, Rhode Island resident of over 30 years, has no criminal record, had (prior to the herein knowingly illegal arrest) never been arrested, was (prior to the State's retaliation resulting from the events herein) a licensed attorney in Rhode Island and Massachusetts (both since 2016 and both with unblemished records), has multiple degrees, has multiple honors, etc., etc.

Defendants are:

-Mark Benjamin (RI Assistant Attorney General) is sued in his personal and official capacity.

-Peter Neronha (Rhode Island Attorney General) is sued in his personal and official capacity.

-Stephen Dambruch (RI Assistant Attorney General, Criminal Division Chief) is sued in his personal and official capacity.

-Susan Urso (RI Assistant Attorney General, Criminal Division Deputy Chief) is sued in her personal and official capacity.

-Richard St. Sauveur, Jr. (SPD Chief in 2023) is sued in his personal capacity.

-Cory Carpenter (SPD Captain in 2023) is sued in his personal and official capacity.

-Gregg Catlow (SPD Lieutenant in 2023) is sued in his personal and official capacity.

-David Walsh (SPD Sergeant in 2023) is sued in his personal and official capacity.

-Douglas Cerce Jr. (SPD Detective Lieutenant in 2023) is sued in his personal and official capacity.

-Joseph Marcello (SPD Detective Sergeant in 2023) is sued in his personal and official capacity.

-John Beausoleil (SPD Investigator in 2023) is sued in his personal and official capacity.

-Michael McCoy (SPD Police Officer in 2023) is sued in his personal and official capacity.

-Gary McDole (SPD Police Officer in 2023) is sued in his personal and official capacity.

-Brendan McDonald (SPD Police Officer in 2023) is sued in his personal and official capacity.

-Gavin O'Keefe (SPD Police Officer in 2023) is sued in his personal and official capacity.

-Robert Squillante (SPD Police Officer in 2023) is sued in his personal and official capacity.

-Santander Bank

-Timothy Wennes (Santander Bank CEO in 2023) is sued in his personal capacity and as CEO of Santander.

-Brian Yoshida (Santander Bank General Counsel in 2023) is sued in his personal capacity and as General Counsel of Santander.

-Robert Bailey (Santander Bank "Head of US Litigation, Enforcement and HR Law" in 2023) is sued in his personal capacity and as Executive of Santander.

-Jeffrey Reilley (Smithfield Santander Branch Manager in 2023) is sued in his personal capacity and as Executive of Santander.

-Ann Pacheco (Smithfield Santander Branch "Operations Manager" in 2023) is sued in her personal capacity and as employee of Santander.

-Michelle Jordan (Smithfield Santander Branch Teller in 2023) is sued in her personal capacity and as employee of Santander.

-John Doe (an employee of Santander) is sued in his personal capacity and as employee of Santander.

-Jane Doe (an employee of Santander) is sued in her personal capacity and as employee of Santander.

-T. Michael Lawton (Smithfield Town Council President in 2023) is sued in his personal and official capacity.

-John Tassoni Jr. (Smithfield Town Council member in 2023 and current Smithfield Town Council President) is sued in his personal and official capacity.

-Michael Iannotti (Smithfield Town Council Vice President in 2023 and present Smithfield Town Council member) is sued in his personal and official capacity.

-Sean Kilduff (Smithfield Town Council member in 2023) is sued in his personal and official capacity.

-Rachel Toppi (Smithfield Town Council member in 2023 and present) is sued in her personal and official capacity.

-Michael Jacome (Narragansett Police Officer in 2023) is sued in his personal and official capacity.

-Daniel J. Passacantilli, Lorraine Passacantilli and Marti Passacantilli are residents of Massachusetts and are sued in their personal capacities.

-Daniel J. Passacantilli and Lorraine Passacantilli are also sued in their capacities as trustees of the "Passacantilli Family 2012 Irrevocable Trust."

-"Passacantilli Family 2012 Irrevocable Trust"

-Joseph Esposito is a resident of Rhode Island and sued in his personal capacity.

-John Doe is believed to be a resident of Rhode Island and sued in his personal capacity.

## **FACTS**

1. On 7/21/23 (four days before Prete was knowingly illegally arrested by SPD), as Prete was finishing hours-long job of cutting the grass, etc. of his mom's property, a man (Daniel J. Passacantilli) came to the property, out-of-nowhere threatened to choke Prete, and, working with Lorraine Passacantilli (Passacantilli's wife) and Marti Passacantilli, attempted to set-up Prete.

2. Daniel Passacantilli (seen on video strategically attempting to conceal himself behind large objects to avoid Prete's surveillance (so his actions wouldn't be recorded)) waited until he believed Prete's mobile camera was off and threatened to choke Prete.
3. **Prete has never met him, spoken to him, had ANY kind of contact with him or his entire family, etc.**
4. Within three (3) MINUTES after a 9-1-1 call was placed (**from inside Prete's home**) against Passacantilli and, specifically, 40 seconds after the 9-1-1 call (**placed from inside Prete's home**) had been completed, knowing that Marti Passacantilli would be questioned (since Passacantilli's falsely alleged excuse for threatening Prete fraudulently involved what appears to be Marti Passacantilli's knowingly false accusation), Lorraine Passacantilli and Marti Passacantilli went to their vehicle and subsequently left the scene.
5. Lorraine and Marti Passacantilli were ALREADY by their vehicle by 5:17:01PM.
6. Per NPD's Log, NPD was only dispatched to the scene at 5:18:22PM (simultaneously as/seconds AFTER Lorraine and Marti Passacanatilli officially left the scene).
7. Two (2) minutes after the Narragansett Police ("NPD") finished speaking to Passacantilli (upon which the officer is seen radioing-in something), Lorraine Passacantilli returned but Marti Passacantilli (who had been with Daniel and Lorraine Passacantilli for the day) didn't return.
8. Thirteen (13) minutes after NPD had left and as soon as Passacantilli had finished speaking to others about the incident (see herein), Daniel and Lorraine Passacantilli went to their vehicle, left, and, within nine (9) minutes returned with Marti Passacantilli (where Marti Passacantilli remained for the rest of the day).

9. NPD Officer Michael Jacome responded to a 9-1-1 call made by Prete's mom regarding Passacantilli's threat.
10. When Jacome arrived, Jacome initially tried to dismiss the scenario without even questioning Passacantilli.
11. Despite seeing that Prete was recording the police encounter, Jacome effectively asked Prete to turn off his camera.
12. Later, Prete, via e-mail, made a Public Records Request to NPD for the police report, body cam footage, etc. of the incident.
13. To protect Passacantilli, Lieutenant Robert Barber, on 8/7/23, via e-mail, denied Prete access to documents, footage, etc. knowingly falsely claiming to do so would be an unwarranted invasion of privacy (note, Prete was the victim, nearly all of Jacome's body cam footage consists of speaking to Prete (on Prete's property), etc.).
14. Barber's blanket "unwarranted invasion of privacy" denial was made as part of NPD's custom and practice (ordered/approved by NPD Chief Sean Corrigan) to always claim that reasoning (whether applicable or not) to prevent records disclosure.
15. When Prete stated he was pressing charges against Passacantilli, Jacome reluctantly went to Passacantilli.
16. Despite knowing he had body cam, though Jacome SLOWLY walked in the direction of where Passacantilli was, Jacome is seen on video looking back towards Prete to see if Prete could see him and his actions from behind an 8-foot solid fence (no way to see through) (as if Jacome was going to pretend to talk to Passacantilli but not actually do so).
17. Because Jacome saw Prete was able to see everything (as captured by Prete's own recording), Jacome reluctantly questioned Passacantilli (but out of Prete's hearing).

18. When Jacome returned to Prete, Jacome didn't declare what Passacantilli said.
19. When Prete specifically asked what Passacantilli said, to protect Passacantilli, Jacome didn't discuss Passacantilli's threat.
20. Prete had to specifically ask if Passacantilli denied issuing a threat.
21. To protect Passacantilli, Jacome connivingly said "No threats were mentioned" (which strategically did not answer Prete's question).
22. To protect Passacantilli, Jacome kept trying to dodge answering if Passacantilli denied issuing any threat.
23. Eventually Jacome stated Passacantilli denied issuing any threat.
24. In other words, among other things, aiding and abetting Passacantilli, Jacome had been trying to prevent Passacantilli's lies, etc. from being uncovered.
25. Daniel Passacantilli (aware his actions were recorded by Prete (Passacantilli could see a camera was pointed directly in his face with the recording light flashing) and despite the incident having occurred just MINUTES before) lied to police and denied issuing any threats.
26. Lying to police is not only itself a crime, but it is also obstruction of justice, etc.
27. Further, given NPD's bodycams, Passacantilli's statements (including, effectively accusing Prete of making a false 9-1-1 call, lying to police that Passacantilli threatened him, etc.) was recorded, became a part of NPD's record, etc.
28. Jacome told Prete NPD needed a copy of the video in order to do anything because, Jacome claimed, as it stood, it was a "he said, she said."
29. NPD's Log of events (which was publicly posted online) shows that Jacome merely "cleared" the incident.

30. Prete e-mailed Corrigan (cc'ing Jacome) providing the video in which the viewer can see and hear Daniel Passacantilli's threat (Passacantilli even put his hand to his throat in a choking gesture to make clear his point).
31. To date, to protect Passacantilli, NPD has not responded to Prete's e-mails asking for an update on what actions have been taken regarding Passacantilli's crimes, etc.
32. Despite the intended plan not having succeeded, once police left, Passacantilli and his wife Lorraine continued with the reputational damage aspect of their plan and, while discussing what had just occurred, defamed Prete to others in the neighborhood (including Joseph Esposito and an unidentified individual).
33. Esposito's daughter, who got startled regarding Passacantilli's actions (as seen on video), had been walking by when Passacantilli made his threat.
34. While NPD was still speaking to Prete, Esposito's daughter returned back to her home.
35. Shortly after returning, and while NPD was still speaking to Prete, Esposito and an unidentified male went over to Passacantilli.
36. Daniel Passacantilli, Lorraine Passacantilli, Joseph Esposito, and the unidentified male spent approximately 25 minutes talking to each other.
37. Joseph Esposito then went home with the unidentified male (who appears to be Esposito's daughter's boyfriend) who both, in turn, continued the Passacantillis' smearing to others.
38. On 7/25/23, Prete's first outing since the Passacantilli attempt, Prete went to the Smithfield, RI Branch of Santander Bank.
39. Michael Prete was co-owner on his family's Santander Bank account which Prete's family had had with Santander (and its predecessors (e.g. Sovereign Bank)) for 28 years.
40. Prete deposited checks (issued to his family) into the account.

41. After the checks were processed, Prete proceeded to deposit cash.

42. As of 12/7/20, Santander instituted a policy that:

> "Santander account holders must present identification when making a cash deposit or payment to a personal account."

43. In other words, as of 12/7/20, Santander account holders would NOT be allowed to deposit cash into their own accounts without identification.

44. For "identification," Santander's policy states:

> "***When you make cash deposits or payments into personal accounts***, we will ask for identification. We encourage use of your Santander debit, credit, or ATM card to do this. A Primary ID such as a driver's license will also be accepted." (No Emphasis Added).

45. Santander's debt card, etc. does not include ANY photo identification.

46. A Rhode Island driver's license is issued by the State of RI and contains, among other things, photo identification.

47. A "REAL ID" credentialed RI driver's license is a federally approved identification that allows the holder to access federal facilities, board federally regulated commercial aircraft, enter nuclear power plants.

48. As of 5/7/25, if someone only has a driver's license that's not "REAL ID" credentialed for identification, the person would not be allowed to board an airplane.

49. Prete's "REAL ID" license was issued January 2020.

50. Without being asked, Prete immediately handed to the teller (Michelle Jordan) his "REAL ID" credentialed driver's license (identification) simultaneously with the cash.

51. Jordan checked, verified, etc. Prete's driver's license identification and proceeded to deposit the cash.

52. Prete AGAIN voluntarily handed to Jordan his driver's license identification because Prete asked to order more checks for his account and Prete didn't know if she needed his identification again.

53. SPD Officer Brendan McDonald walked into Santander Bank and, despite no one from Santander having called SPD (as acknowledged in SPD's police report) and despite a Santander employee informing and making expressly clear to McDonald that there were no issues of any kind (as admitted in SPD's police report) and the employee's statements were made freely and without any duress, etc. (as demonstrated by the care-free atmosphere of all employees and customers) (stated differently, no probable cause, etc.), as seen on Santander surveillance, McDonald began immediately instructing a still unidentified female employee ("UFE") so SPD could arrest Prete.

54. Prior to 7/25/23, no member of SPD has ever met, interacted with, etc. Prete (or Prete's family) and SPD's at the other end of the State (Smithfield, RI) from where Prete lives (Narragansett, RI).

55. Prete has no criminal record, had (prior to SPD's knowingly illegal arrest) never been arrested, etc.

56. Conforming to customs, SPD has a history of falsely claiming to receive anonymous tips to justify conducting illegal searches, etc. (*See* e.g. *Heckmann v. McDonald*, et al, 1:2019-cv-00472 (where SPD's claimed anonymous tip led to McDonald and other officers (including one of the officers at issue here (McDole)) breaking into a store, attacking the owner (according to the owner's lawsuit, the attack resulted in permanent injuries to his genitalia (per his doctor's diagnosis), etc.), etc.), Ricci v. State of RI and Town of Smithfield, et al (1:20-cv-00543-MSM-PAS) (where SPD's claimed confidential informant tip (which the

affiant SPD officer (Joseph Marcello) later admitted they lied to a Judge about having received (perjury)) led to illegal searches, seizures, arrest, etc. (a case in which the Town of Smithfield paid $600,000 to the victim to settle))).

57. Santander surveillance footage shows McDonald positioned himself in a corner area (for approximately 45 seconds (believing no surveillance would capture his actions)) writing on a piece of paper, went into a back area office, handed the paper (as seen on surveillance) to UFE (whose identity is, to date, being concealed by Santander, SPD, Prosecution, etc. (in violation of Prete's Sixth Amendment) and who is NOT a confidential informant, etc.).

58. Unlike the UFE, Santander employee Ann Pacheco was personally dealing with Prete's cash deposit (including inspecting and administering multiple authentication tests on both bills (watermark verification, security thread verification, etc.) (as shown on surveillance) and each bill repeatedly testing GENUINE), had knowledge of Prete's driver's license identification (as well as Prete's other personal/confidential information (e.g. social security number, e-mail address, etc.)), etc.

59. Pacheco is a self-described 43-year expert with "…much experience with counterfeit."

60. At the time of the incident, Pacheco was (as she declared) the highest-ranking employee present.

61. As seen on surveillance, Pacheco saw McDonald and had multiple opportunities (including when Pacheco had walked away from Prete while Prete waited at the teller station) to call out for, signal, or otherwise involve SPD (e.g. silent alarm) but Pacheco did not.

62. Upon receipt/speaking to SPD, UFE is seen, AFTER McDonald LEFT SANTANDER, acting on McDonald's instructions (with paper in-hand (exculpatory evidence, since destroyed)) leading to Prete's false arrest.

63. While UFE acted on McDonald's instructions, SPD officers waited outside for UFE to complete her instructions.

64. Shortly after, UFE walked outside the building to where she knew McDonald would be waiting for her to meet back and falsely accuse Prete of allegedly passing two counterfeit bills.

65. At the time of the accusation, the bills were in Santander's custody.

66. McDonald's, UFE's, etc. scheme to take down Prete involved obtaining Prete's GENUINE bills from Santander's custody upon the false pretense that they were counterfeit.

67. SPD's own police report admits UFE had no firsthand knowledge, proof, etc. of the alleged crime.

68. After coming back into the building, UFE approaches Pacheco (who was making photocopies) and shows Pacheco what appears to be the same paper McDonald gave UFE.

69. When Pacheco returned to Prete, Pacheco abruptly ceased further interaction with Prete.

70. Six officers (including K-9 unit) (Lieutenant Gregg Catlow, Sergeant David Walsh, Investigator John Beausoleil, Michael McCoy, Gary McDole, Brendan McDonald (the arresting officer (who sexually assaulted Prete (fondling Prete's penis and testicles) approximately a dozen times and who, as later discovered, has a documented history of going after male genitalia (*See* e.g. *Heckmann v. McDonald*, et al, 1:2019-cv-00472)))) (REPRESENTING APPROXIMATELY HALF OF SPD'S ON-DUTY POLICE FORCE) swiftly swarmed the bank for what they knew, in advance, was only an alleged non-violent offense with only one individual involved.

71. Without asking to see the bills (the supposed evidence of crime), without questioning Pacheco, etc. and with Prete inches away from sitting down in the waiting (seating) area

(where Prete had been sitting and was going back to sitting after having briefly asked Pacheco for information) (since he had to wait to speak to a different employee to order checks (as Jordan and Pacheco had advised)), McDonald immediately grabbed Prete, handcuffed Prete behind his back, put Prete up against a counter in front of a "wall" (which also happened to be in front of an ATM machine) and immediately began frisking Prete.

72. Neither McDonald nor any other officer informed Prete he was being arrested, detained nor even explained why they were doing what they were doing.

73. Since resisting arrest (even resisting a false arrest) is itself a chargeable offense, Prete didn't resist, etc.

74. Not getting any reaction from Prete and while at least one officer (Investigator John Beausoleil) looked on, McDonald began fondling Prete's penis and testicles.

75. Prete still didn't resist, etc.

76. However, Prete announced McDonald had sexually assaulted him.

77. Beausoleil did not intervene.

78. Prete also announced he was recording the situation.

79. RI is a one-party consent State (meaning only one party to a conversation needs to consent in order to record).

80. McDonald provokingly declared it's going to happen more.

81. Prete still didn't resist, etc.

82. McDonald has a documented history of going after male genitalia (*See* e.g. *Heckmann v. McDonald*, et al, 1:2019-cv-00472).

83. Beausoleil again did not intervene.

84. Instead, Investigator Beausoleil grabbed Prete's recording device (which, in no way was interfering with, impeding, etc. any officer's actions, etc.) and immediately proceeded to shut it off.

85. Investigator Beausoleil did not ask permission to shut off the recording device and Prete did not give permission for the recording device to be stopped, shut off, etc.

86. Hadn't it been for Prete noticing and trying to announce (for the recording) what Beausoleil was doing, Beausoleil would've done so (while Prete was being abused, etc.) without anyone noticing (and, thus, Beausoleil, etc. would've blamed the missing recording, etc. on faulty technology, etc.).

87. Side note, setting aside that, if Prete had attempted to reclaim his property from Beausoleil, SPD would've falsely accused Prete of attempting to assault an officer (since Beausoleil wouldn't have voluntarily given it up), when Beausoleil grabbed Prete's recording device to shut it off, etc., Prete was already handcuffed behind his back.

88. Beausoleil turned the recording device power off.

89. Investigator Beausoleil did not attempt to save (preserve) the in-progress recording nor did Beausoleil ask how to save (preserve) the in-progress recording.

90. As Investigator Beausoleil knew and premeditatively planned, suddenly turning off the power would highly likely result in NOTHING being saved from the in-progress recording (in other words destroying evidence and future evidence).

91. McDonald continued to sexually assault Prete (including before being placed in the police cruiser, etc. (in all, McDonald sexually assaulted Prete approximately a dozen times)).

92. Prete still didn't resist, etc.

93. Without a warrant, without any exigent circumstances, etc., SPD opened and searched through Prete's sealed belongings (which were several feet away from Prete (nowhere within Prete's reach)).

94. Contained in those sealed belongings was an additional recording device recording SPD's actions.

95. Santander surveillance footage shows that once SPD learned that Prete was recording them, they swiftly went to verify if there were any other ongoing recordings.

96. Nobody asked permission to shut off Prete's recording device nor did Prete give permission.

97. The officers did not attempt to save (preserve) the in-progress recording nor did they ask how to save (preserve) the in-progress recording.

98. The officers took out the batteries to the recorder (while the recording was in progress). As these officers knew and premeditatively planned, a sudden loss of power (taking out the batteries) would ensure NOTHING would be saved from the in-progress recording (in other words destroying evidence and future evidence).

99. Throughout the entire ordeal, SPD officers (including McDonald, a Lieutenant, Sergeant, Investigator, etc.) refused to hold the bills (the falsely alleged basis of the knowingly illegal arrest) up to the light (among other things, they knew they were under surveillance cameras and they didn't want it on record that they knew the bills were GENUINE (as repeatedly confirmed (as shown on surveillance) by Pacheco) (FURTHER PROVING THEY WERE FULLY AWARE OF THEIR KNOWINGLY ILLEGAL ARREST)).

100. Santander surveillance shows that SPD officers' actions were so absurd that when Pacheco placed the bills onto the counter in front of McDole, McDole quickly moved away,

turned his head and body away and put up his hand (signally he didn't want to see them) (actions of someone who didn't want legal knowledge of their authenticity).

101. With Prete not having resisted at any point, SPD knowing no crime had been committed, etc., Santander surveillance shows, while one officer maintained custody of Prete, the other five SPD officers weren't inspecting any alleged evidence, questioning any alleged witnesses, etc. but five grown men huddled together talking with each other (effectively, what do we do).

102. Without a warrant, SPD even searched Prete's LOCKED vehicle (which was outside in the parking lot).

103. In an effort to, among other things, raid Prete's residence, SPD falsified documentation claiming things like Prete's mom was the operator of the vehicle on scene.

104. Not only was Prete alone (as SPD knew and confirmed) but Prete's mom (who is and was not doing well) was approximately 32 miles away at home (at the other end of the state).

105. As seen on Santander surveillance, Pacheco had (voluntarily) provided Prete with photocopies of the front and back of both of Prete's bills.

106. As seen on Santander surveillance, SPD is seen confiscating Prete's photocopies and leaving Santander with them in-hand.

107. SPD later destroyed Prete's photocopies (as demonstrated by SPD's Seizure Report not listing the photocopies (but taking the time to inventory a Voided check from Prete's bank account), Prete's e-mail to SPD requesting return of his property (among which included the photocopies) and SPD Chief not acknowledging they even existed, etc.).

108. To ensure there was no documentation demonstrating the existence of the photocopies, SPD never provided Prete with a listing of his Property. Instead, as shown in "Exhibit 14" of

the Prosecution's Information Charging Package, SPD falsified documentation claiming Prete "Refused to sign" a listing of his alleged "Property." As Prete's filings have stated:

> "If [SPD] would have presented [Prete] with that form, [Prete]would have written on the document stating things like the copies of each bill Santander made and provided [Prete] (four (4) pages total (front and back of each bill)) were confiscated by Police and not declared and returned. Among other things, the SPD premeditatively, etc. falsified documents, defamed [Prete], etc." (No Emphasis Added).

109. To date, SPD, Prosecution, etc. refuse to produce SPD's police station surveillance footage (despite Prete's repeated requests).

110. The police station footage would show, among other things, the above referenced document was NEVER presented to Prete.

111. While everyone was still at Santander, **<u>the gold mark on both bills</u>** (from the pen detector test administered by the 43-year expert Santander employee (indicating the bills are authentic)) **<u>were still clearly visible therefore EACH OFFICER HAD PRIMA FACIE EVIDENCE THE BILLS TESTED GENUINE YET THEY STILL PROCEEDED WITH THEIR KNOWINGLY ILLEGAL ARREST.</u>**

112. SPD officers (including McDonald, a Lieutenant, Sergeant, Investigator, etc.) refused to hold the bills (the falsely alleged basis of the arrest) up to the light (among other things, they knew they were under surveillance cameras and they didn't want it on record that they knew the bills were GENUINE (as repeatedly confirmed (as shown on surveillance) by the 43-year expert Santander employee) (FURTHER PROVING THEY WERE FULLY AWARE OF THEIR KNOWINGLY ILLEGAL ARREST)).

113. **<u>McDonald acknowledged having no evidence a crime had been committed, SPD had no probable cause to arrest Prete, and SPD later was caught admitting the bills were GENUINE.</u>**

114. Against Prete's will, SPD took Prete out of the building to the police car and transported Prete to SPD.

115. After SPD took Prete out of the building, Officer Michael McCoy commenced taking Witness Statements from Jordan and Pacheco (but not UFE (the person McDonald instructed, who accused Prete of committing a crime, etc.)).

116. Prete was taken out of Santander at 2:56PM (per Santander surveillance footage) and McCoy took the TWO Witness Statements at 3:04PM.

117. Note, Santander/SPD cut off their surveillance footage before McCoy proceeded to take the witness statements.

118. Witness Statements are supposed to obtain any and all facts from witnesses.

119. At the direction of McCoy, etc., Pacheco and Jordan were coached, etc. what to write down (including leaving out obvious important exculpatory facts (evidence demonstrating Prete didn't commit any crime)).

120. To, among other things, legitimize their illegal warrantless arrest, SPD instructed two Santander employees to, among other things, leave out exculpatory testimony including, but not limited to, the 43-year expert Santander employee inspecting and administering multiple authentication tests on both bills (watermark verification, security thread verification, etc.) (as shown on Santander surveillance footage) and each bill repeatedly testing GENUINE, Prete TWICE voluntarily handing his driver's license identification to Santander (once simultaneously with his cash deposit and another time to order more checks for his account),

Prete's account was a 28-year-old account (which Santander had on file Prete's social security number, address, date of birth, personal e-mail address, etc.), etc.

121. Example, BOTH Pacheco (a self-described 43-year expert) and Jordan use the same vague non-descriptive wording (wording which tries (but fails) to find the balance between not being held accountable for lying in a written police statement and trying to manufacture probable cause).

122. Another example, BOTH Pacheco and Jordan left out that Prete provided (TWICE and VOLUNTARILY) his driver's license identification (as seen on Santander surveillance).

123. Prete providing his driver's license identification TWICE and VOLUNTARILY is exculpatory evidence as to knowledge/intent (an element of the crime charged), etc. (a person who knew they were committing a crime (e.g. passing counterfeit bills) would not have identified themselves (via GOVERNMENT IDENTIFICATION) IN ADVANCE of committing a crime).

124. It's impossible for BOTH Pacheco and Jordan to forget that Prete provided his driver's license since Santander's policy PROHIBITS cash deposits without individuals providing identification.

125. Another example, Pacheco (a self-described 43-year expert) inexplicably left out the results of her administration of multiple authentication tests (watermark, security thread, etc. authentication tests (as Pacheco's seen on Santander surveillance conducting)) (where she had confirmed the bills were GENUINE); results that no expert would have forgotten, neglected, etc. to mention.

126. The bills repeatedly testing GENUINE is exculpatory evidence (e.g. the bills are NOT counterfeit and thus no crime was committed).

127. A 43-year expert would not forget about critical facts concerning THE MOST CRITICAL AUTHENTICATION TESTS she administered (e.g. watermark, security thread, etc.) just MINUTES earlier.

128. **HAD THE BILLS FAILED PACHECO'S WATERMARK, SECURITY THREAD, ETC. VERIFICATIONS (which would be seemingly objective proof of counterfeit (A.K.A. probable cause to believe a crime was committed)), THOSE FAILURES WOULD HAVE BEEN THE SOLE FOCUS OF PACHECO'S WITNESS STATEMENT. FURTHER, SPD WOULD HAVE MADE SURE TO FLAUNT THAT INFORMTION.**

129. Another example, Pacheco's Witness Statement even notes that Pacheco was specifically asked "Is there anything else you would like to add to this statement?" and Pacheco again didn't declare exculpatory evidence; Pacheco (a self-described 43-year expert) STILL did NOT state she had conducted multiple other authentication tests (as Pacheco's seen on Santander surveillance conducting) (and she had confirmed the bills were GENUINE).

130. Not only did Santander/SPD cut off their surveillance footage before McCoy proceeded to take the witness statements, Santander/SPD also cut off their surveillance footage regarding what bills were transferred to SPD. In other words, there is no evidence as to what bills were transferred, when the bills were transferred, who transferred the bills to whom, etc.

131. Moreover, contrary to bank procedure, neither Pacheco nor any bank employee initialed, nor were they instructed to initial, the bills (a way to identify those are the bills at issue).

132. Prior to being processed (booked, etc.), Prete advised McDonald that SPD had no probable cause (and therefore SPD could not legally arrest Prete) (since SPD had no evidence

a crime had been committed (e.g. SPD hadn't determined the bills were counterfeit)) to arrest Prete until it's been determined (by the Secret Service) that the bills are allegedly counterfeit.

133. Though deceptively presented by McDonald, Prete's statement advising McDonald of SPD's knowingly illegal arrest is corroborated in McDonald's police report.

134. McDonald acknowledged having no evidence a crime had been committed and SPD having no probable cause to arrest Prete.

135. McDonald responded that if the Secret Service found the bills were genuine, Prete can simply file to have his arrest EXPUNGED.

136. Had Prete's recorder not been illegally shut off by SPD, Prete's recorder would have captured McDonald's admission of knowingly illegal arrest, etc.

137. While being booked by SPD Officer Gavin O'Keefe, O'Keefe asked McDonald what Prete was being charged with (so O'Keefe could enter it into the paperwork).

138. McDonald responded to O'Keefe that he did not know yet, to leave it blank for now, and to continue the booking process.

139. During the booking process, Prete overheard officers state that the bills were GENUINE.

140. When Prete repeated to O'Keefe what the officers had JUST stated, O'Keefe claimed (without even inquiring, etc.) the officers were just "joking" and forced the booking process to continue.

141. Despite the serial numbers to the bills being crystal clear, SPD's arrest report falsely declared the serial numbers to the bills were "NOT AVAIL[ABLE]" (exact quote).

142. Recall, SPD destroyed Santander's provided photocopies of the front and back of each bill, Santander/SPD cut off footage demonstrating what bills were transferred to SPD, contrary to bank procedure neither Pacheco nor any bank employee initialed nor did SPD

instruct them to initial either bill, SPD claims the serial numbers to the bills (which are unique identification) are "NOT AVAIL[ABLE]" (exact quote), etc.

143. Prete was locked in a jail cell until a Bail Commissioner came.

144. With no probable cause of the existence of any crime, Prete was placed under bail conditions including: requiring Prete to appear at a set date, time, and location, requiring Prete (a licensed Massachusetts attorney) not to leave RI, etc.

145. After finished with the Commissioner, Prete was not presented with any documentation to sign (e.g. inventory of Prete's belongings).

146. Despite there being a table(s) nearby, Prete's belongings (e.g. Prete's clothing, etc.) were dumped on the floor for Prete to pick up.

147. While Prete tried to collect his belongings from the floor, an SPD officer stood by Prete telling him to hurry up and leave the building.

148. As Prete would later discover, among other things, **SPD FALSIFIED THEIR POLICE REPORT TO ATTEMPT TO JUSTIFY THEIR KNOWINGLY ILLEGAL ARREST AND ENSURE PRETE WAS FORCED INTO THE SYSTEM. SPD FALSIFIED THEIR POLICE REPORT IN MULTIPLE WAYS.**

149. Among other issues, SPD's police report was written in such a way as to portray vast criminality by Prete when in reality they not only KNEW no crimes of ANY kind had been committed but they ADMITTED the bills were GENUINE.

150. As seen on Santander surveillance footage, Pacheco had spent several minutes collecting, among other things, the various identifying information (e.g. serial numbers, etc.) from both bills.

151. Pacheco's witness statement demonstrates that she informed SPD of such compiled identifying information.

152. Instead of asking for a copy of Pacheco's information to be added as evidence for the file, as Prete would also later discover, **SPD effectively instructed Santander to destroy (and Santander has confirmed it did destroy) Santander's records of the serial numbers of Prete's bills, etc.**

153. The same SPD who took the time to illegally confiscate and inventory an irrelevant Voided check from Prete's bank account.

154. Despite Santander having reviewed, accepted, and cashed the checks Prete presented, despite SPD, etc. knowing no crimes of any kind were committed, SPD instructed Santander to see what they could create for those check deposits (e.g. check fraud, etc.).

155. At the time of SPD's instructions, the checks were in Santander's custody.

156. SPD's, Santander, etc. scheme to take down Prete involved attempting to obtain Prete's family's checks from Santander's custody upon false pretenses (e.g. check fraud, etc.).

157. On 7/26/23 at 9:51AM (less than 24 hours after the incident), Prete e-mailed Santander's CEO (Timothy Wennes) and General Counsel (Head Lawyer) (Brian Yoshida) a Preservation (Legal) Notice (advising of the date and branch location of the incident and advising to keep relevant records, etc.) and requested the name of the Branch manager.

158. On 7/27/23 at 10:32AM, not having received a response, Prete again e-mailed Santander's CEO and General Counsel requesting the name of the Branch manager and further elaborating on Prete's Preservation (Legal) Notice.

159. On 7/27/23 at 4:31PM (six hours later), Robert Bailey (Santander "Head of US Litigation, Enforcement and HR Law" and seasoned lawyer of over 30 years), speaking on

behalf of Timothy Wennes, Brian Yoshida, and Santander, e-mailed Prete claiming Santander didn't know what Prete was referring to and Prete's Preservation Notices were, therefore, unsupported (in other words, they would not preserve the videos, etc., etc., etc.).

160. On 7/31/23 at 9:30AM, SPD placed only FOUR (4) STILL IMAGES (taken from VIDEO footage) from the several minutes-long Santander incident. The STILL images came FROM VIDEO footage yet the VIDEO footage was not placed into the file.

161. Given that the images entered are from different cameras (as seen from the images) and are spread across several minutes, the images confirm that SPD, etc. reviewed all of Santander's surveillance footage and selectively chose particular images.

162. SPD, etc. chose to intentionally LEAVE OUT EXCULPATORY IMAGES (including, but not limited to, Pacheo administering her authentication tests (and each bill repeatedly testing GENUINE), Prete (after having dealt with Jordan/Pacheco) going to the waiting area and sitting, Prete leaving the seating area to ask Pacheo a question and then returning to the waiting area to sit, etc.).

163. On 7/31/23 at 12:33PM, because Prete provided even more specifics (thus forcing Santander to admit the existence of the incident), Bailey, speaking on behalf of Timothy Wennes, Brian Yoshida, and Santander, finally acknowledged the existence of the incident but refused to provide any information (including the name of the Branch manager).

164. In accordance with RI Public Records Law, Prete requested documents, etc. from SPD regarding the knowingly illegal arrest.

165. On 8/1/23 at 3:10PM, in response to Prete's RI Public Records ("APRA") Request, other than a redacted portion of the arrest report and redacted portion of dispatch log, SPD Police

Chief Richard St. Sauveur denied Prete to ALL other documents, etc. (including Prete's requested mug shot, list of SPD employees, etc.) claiming there was ongoing investigation.

166. As SPD's own records demonstrate, as of 8/1/23 at 3:10PM (a WEEK after Prete's illegal arrest), SPD had NO ongoing investigation.

167. To legitimize Sauveur's claim of ongoing investigation, Sauveur instructed SPD Detective Lieutenant Douglas S. Cerce Jr. to criminally forge a USSS "COUNTERFEIT SUBMISSION REPORT" (No Emphasis Added).

168. On 8/1/23 at **3:50PM**, SPD Detective Lieutenant Cerce Jr. entered into the record a signed statement claiming (in full):

> "A submission to the United States Secret Service US Dollars website was made for the 2 **SUSPECTED** counterfeit notes. Submission 111-2023-000321-W was made via the USSS portal." (Emphasis Added).

169. A "COUNTERFEIT SUBMISSION REPORT" (No Emphasis Added) dated 8/1/23 and its instructions were added to the file. Evidence later surfaced, from the U.S. SECRET SERVICE, that this "COUNTERFEIT SUBMISSION REPORT" is a fake (forged) document.

170. Prete was knowingly illegally arrested on 7/25/23 and SPD only BEGAN its alleged investigation of the bills on 8/1/23 (AN ENTIRE WEEK LATER). **How can someone be arrested before there's even confirmation the bills are counterfeit? Answer: You CAN'T.**

171. The USSS Submission Report Instructions specifically instructs:

“**Please make certain you have written the submission number and specific line item number in the top margin on the back of each counterfeit note.**” (No Emphasis Added).

172. Despite SPD’s police file containing six (6) different pictures of the alleged bills no picture shows the bills with the above instructed information.

173. For two MONTHS, despite no probable cause, per a signed, sworn affidavit by St. Sauveur, SPD and the RI Attorney General’s Office conducted (illegally) “…joint [] investigation…” against Prete.

174. Since documents continue to be concealed from Prete, it’s unclear if any warrants were obtained. If no warrants were obtained, warrantless searches and/or seizures occurred. If warrants were obtained, false information was submitted in the warrant applications (something SPD has a history of (see e.g. Ricci v. State of RI and Town of Smithfield, et al (1:20-cv-00543-MSM-PAS) (where SPD’s claimed confidential informant tip (which the affiant SPD officer (Joseph Marcello) later admitted they lied to a Judge about having received (perjury)) led to illegal searches, seizures, arrest, etc. (a case in which the Town of Smithfield paid $600,000 to the victim to settle))).

175. On 8/2/23 at 1:10PM, after e-mailing Pacheco (about the information she had collected from Prete’s bills during the 7/25/23 incident (since Pacheco had stated she would send Prete a copy of everything)), Smithfield Santander Branch Manager Jeffrey Reilley intervened.

176. Reilley e-mailed Prete indicating the information (exculpatory evidence) Pacheco had collected on 7/25/23 and memorialized had been destroyed.

177. On 8/2/23 at 1:58PM, Prete e-mailed RI Attorney General Peter Neronha for documents, etc. related to his arrest, etc.

178. On 8/2/23 at 3:20PM, RI Assistant Attorney General Mark Benjamin e-mailed Prete declaring he'd been assigned (specifically by RI AG Peter Neronha) to Prete.

179. On 8/3/23 at 9:15AM (allegedly), select, incomplete, no audio, etc. Santander surveillance footage "…was burned to a CD and issued property # 23-256-PR."

180. Among other issues, Santander's ATM footage (showing, among other things, McDonald's sexual assaults) were not placed into the file, camera angles missing, there's no audio to any of the footage placed into the file (recall, SPD illegally shut off both of Prete's recording devices (and attempted to destroy Prete's existing recordings)), Santander's surveillance footage is CUT OFF immediately before SPD obtained coerced false Witness Statements AND before SPD took custody of the bills, etc.

181. A letter dated 8/3/23 (titled AFFIDAVIT) (unsigned, unnotarized, etc.) allegedly from USSS is generated regarding "an investigation involving Detective Sergeant Joseph Marcello" (an officer who has been exposed for his ability and willingness to LIE, FALSIFY, COMMIT CRIMES, etc. (*see Ricci v. State of RI and Town of Smithfield*, et al (1:20-cv-00543-MSM-PAS) (a case in which the Town of Smithfield paid $600,000 to the victim to settle))) claiming the bills are allegedly counterfeit because the watermark portrait, security thread, etc. are incorrect (whereas Santander surveillance footage shows the State's own 43-year expert witness determined, at the time of the alleged incident and directly contradicting State's forged (counterfeited) letter, that the watermark portrait, security thread, etc. were CORRECT).

182. The 8/3/23 alleged letter/"Affidavit" is allegedly from "Chad Rosenbecker" who, per the letter, was "…currently assigned to the Providence[, RI] Resident Office."

183. USSS's Submission Report Instruction specifically instructs:

**"Please send your submission to the Counterfeit Currency Processing Facility (CCPF):**

**CCPF-541A**

**301 14th Street, SW**

**Washington, D.C. 20228**" (No Emphasis Added)

184. Accordingly, allegedly, between 8/1/23 at 3:50PM and end of day on 8/3/23 (in other words, at most 48 hours), the bills were:

-picked up by/dropped off at USPS/a courier service

-traveled by mail/courier from Smithfield, RI to Washington, D.C. (over 400 miles (one-way))

-delivered to Washington, D.C.

-opened by Washington DC's CCPF

-processed by Washington DC's CCPF

-traveled physically (or electronically) to Providence, RI

-delivered to Providence, RI

-opened by Chad Rosenbecker

-Rosenbecker allegedly analyzed the bills and submitted queries through USSS's database

-Rosenbecker allegedly wrote his letter

All within at most 48 hours.

185. **<u>Attached (which were forged (counterfeited), etc. by RI) are:</u>**

-Prosecution's Exhibit #11 (attached labeled "Exhibit USDCRIMPC1"): alleged USSS letter/"Affidavit" dated 8/3/23

-Prosecution's Exhibit #10 (attached labeled "Exhibit USDCRIMPC2"): alleged "COUNTERFEIT SUBMISSION REPORT" (No Emphasis Added) dated 8/1/23 (and its instructions) by SPD Detective Lieutenant Douglas S. Cerce Jr.

-Prosecution's Exhibit #7 (attached labeled "Exhibit USDCRIMPC3"): signed statement by Cerce Jr. entered on 8/1/23 at 3:50PM stating (in full):

> "A submission to the United States Secret Service US Dollars website was made for the 2 **SUSPECTED** counterfeit notes. Submission 111-2023-000321-W was made via the USSS portal." (Emphasis Added).

186. **USSS declared to Prete in, not one but, TWO separate letters (both sent via e-mail) for two separate FOIAs (#20230784 and #20230856) that USSS DOESN'T HAVE ANY RECORDS OF ANY KIND (E.G. SUBMISSION (e.g. 111-2023-000321-W), TESTS, LETTER, ETC.) OF, ABOUT, CONCERNING, ETC. THE BILLS, ETC.**

187. **Both Prete's FOIA Requests and USSS's "No Records" response ARE PUBLICLY AVAILABLE ON USSS'S WEBSITE (https://www.secretservice.gov/sites/default/files/reports/2025-01/FOIA-Log-FY-2023.pdf (*see* pgs.70, 78))** (*See* attached labeled "Exhibit USDCRIMPC4" for relevant pages of USSS's Fiscal Year 2023 FOIA Log).

188. **Attached are:**

-USSS's first FOIA e-mail letter dated 8/24/23 (attached labeled "Exhibit USDCRIMPC5") (regarding FOIA #20230784) (covering the period of 7/25/23-8/10/23 (as clarified by USSS FOIA Officer Kevin Tyrrell's e-mail dated 8/25/23 (attached labeled "Exhibit USDCRIMPC6"))

-USSS's second FOIA e-mail letter dated 8/31/23 (attached labeled "Exhibit USDCRIMPC7") (regarding FOIA #20230856) (covering the period of 8/1/23-8/25/23)

189. Both USSS FOIA e-mail letters definitively state:

"The Secret Service FOIA Office searched all Program Offices that were likely to contain potentially responsive records, and no records were located."

190. Given that USSS has no records of any kind of a letter/"Affidavit," a USSS portal submission, etc., per USSS, RI FORGED the alleged "Affidavit," USSS portal submission, etc. in order to bring its fraudulent, etc. prosecution against Prete.

191. **WITHOUT THE FORGED LETTER /"Affidavit" DATED 8/3/23, THE PROSECUTION HAS NO CASE.**

192. On Friday, 8/4/23 at 11:51AM, Benjamin e-mailed Prete (not cc'ing his superiors) stating that unless Prete provided him with irrelevant information, Benjamin would not provide Prete with publicly available records.

193. Benjamin, who had initially cc'ed his superiors (Peter Neronha (RI AG), Stephen Dambruch (Assistant AG, Criminal Division Chief), Susan Urso (Assistant AG Criminal Division Deputy Chief)) on his e-mail to Prete and despite Prete cc'ing them on his e-mails, chose to NOT "cc" his superiors on his 8/4/23 extortion e-mail.

194. On 8/4/23 at 1:19PM, Prete e-mailed Benjamin (cc'ing Neronha, Dambruch, and Urso) complying with Benjamin's extortion and noting the extortionary nature of the e-mail.

195. Benjamin not only didn't provide the publicly available records, etc., Benjamin ceased communications with Prete.

196. On 8/2/23, Prete unexpectedly obtained the name and e-mail address of the Smithfield Santander Branch Manager (Jeffrey Reilley).

197. On 8/3/23, Prete e-mailed Reilley a preservation notice (to preserve everything related to the Santander incident).

198. On Friday, 8/4/23 at 3:46PM, Santander attorney Bailey (speaking on behalf of Timothy Wennes, Brian Yoshida, and Santander) e-mailed Prete threatening that if Prete continued to e-mail Santander employees, Santander would, among other things, submit a frivolous ethics complaint against Prete's law license(s).

199. On 8/17/23, Prete e-mailed Bailey (cc'ing Pacheco, Jordan Reilley, Wennes, etc.) noting, among other things, exculpatory evidence demonstrating Prete's innocence of the fraudulent accusation created by SPD's and Santander's conspiracy.

200. Despite receiving Prete's e-mail, to Prete's knowledge, neither Pacheco nor Jordan corrected testimony provided in their witness statements, etc.

201. Between 8/28/23 at 6:39PM and 8/29/23 at 2:16PM, Santander closed (without notice, advisement, etc.) Prete's family's 28-year account.

202. Santander had kept Prete's family's account open despite Prete's arrest, despite e-mailing Santander's CEO and General Counsel, etc.

203. Santander's spontaneous account closure came just two business days after Prete received USSS's first FOIA e-mail letter (demonstrating RI FORGED the alleged "Affidavit," USSS portal submission, etc.) and Prete submitted his second FOIA Request (FOIA #20230856) (which would again demonstrate RI FORGED the alleged "Affidavit," USSS portal submission, etc.).

204. Santander has a contract with RI to provide banking service to the State.

205. As Santander is fully aware (among other things, since Santander has a history of Prete's account), Santander's spontaneous closure also came just THREE (3) DAYS BEFORE

PRETE'S MOM'S PENSION PAYMENT (WHICH IS PRETE'S FAMILY'S ONLY INCOME SOURCE) WAS SUPPOSED TO BE DIRECTLY DEPOSITED INTO THE ACCOUNT.

206. On 9/11/23 at 9:17AM, Prete e-mailed AG Neronha (cc'ing Benjamin, etc.) noting the illegality of SPD's actions, the existence of exculpatory evidence (including describing and discussing the evidence), etc.

207. Prete's 9/11/23 at 9:17AM e-mail also stated things like: The moment the AG's Office got this case and there was no proof in the file from USSS that the bills are counterfeit, the AG's Office was REQUIRED to IMMEDIATELY drop everything.

208. On 8/4/23 at 11:51AM, Benjamin had e-mailed Prete stating "Smithfield has given us a portion of their investigation…"

209. In other words, the moment Benjamin got the file on 8/4/23, Benjamin should've immediately dismissed everything since the bills were genuine.

210. Amazingly, there's a miraculous letter dated 8/3/23 (the day before the file hit Benjamin's desk) allegedly from USSS (which USSS's records demonstrate is a fake (forgery)).

211. Among other things, Prete's e-mail dated 9/11/23 at 9:17AM also reminded Neronha (and Benjamin (who was cc'ed)) of the exculpatory evidence ALREADY in the AG's possession, the exculpatory testimony their star 43-year expert witness would be forced (under oath) to expose at trial (e.g. the expert witness conducted multiple authentication tests on both bills (as seen on Santander surveillance footage) and each bill repeatedly tested GENUINE, Prete provided his driver's license identification, et. (corroborated by evidence in the AG's possession (e.g. Santander surveillance footage))), etc.

212. That same day, on 9/11/23, Benjamin sought out **SPD Captain Cory Carpenter to suborn perjury (see Prosecution's Information Charging Package Exhibit #1) in an attempt to, among other things, nullify Prete's e-mail.**

213. Carpenter's statement essentially only stated he has read documents and, based on those documents (which he specifically states he is relying on), he claims the facts are true (despite not being present at the time of the arrest, not involved in the booking process, etc.).

214. Carpenter's "**CRIMINAL INFORMATION AFFIDAVIT**" (No Emphasis Added) dated 9/11/23 states (in full):

> "I, Cory Carpenter, a peace officer of the City/Town of Smithfield, County of PROVIDENCE, State of Rhode Island, being duly sworn by the (Special Assistant Attorney General, of the State of Rhode Island, do hereby make affidavit and upon oath, depose and say that the matters contained herein have been investigated by my department and I have knowledge thereof and that the facts contained herein are true to the best of my knowledge and belief.
>
> Attached hereto and made a part hereof is a Police Narrative with exhibits attached thereto, upon which I rely to further demonstrate the existence of probable cause to believe that the offense(s) charged in the Information have been committed and that the defendant(s) committed the offense(s)."

215. Carpenter's subsequent "**POLICE NARRATIVE**" (No Emphasis Added) (which Carpenter signed "I swear that the facts which follow are true to the best of my knowledge") dated 9/11/23 makes no mention, reference, etc. to EITHER SPD Detective Cerce Jr.'s

"COUNTERFEIT SUBMISSION REPORT," the alleged USSS Affidavit allegedly confirming to SPD that the bills are counterfeit, etc.

216. Notice Carpenter states he's "swear[ing]" things under "oath." As a result, he makes no mention, reference, etc. to alleged facts (e.g. the forged USSS Affidavit dated 8/3/23) which seemingly conclusively demonstrate the bills are counterfeit. Instead, Carpenter's "POLICE NARRATIVE" merely regurgitates the time, date, and location of the incident, what Prete was charged with, etc.

217. As Carpenter knew, perjury is a crime.

218. Prete's 9/11/23 e-mail also made a RI Public Records Request ("APRA") request upon the RI AG's Office for documents, etc.

219. On 9/26/23, **when Prete attempted to follow-up on Prete's APRA request (since there was no response), PRETE DISCOVERED HIS E-MAIL ADDRESS WAS BLOCKED FROM E-MAILING THE ENTIRE AG'S OFFICE (including the Open Government Division).**

220. Given the ongoing nature of the criminal enterprise, this filing is effectively being submitted in emergency fashion. Prete incorporates by reference in their entirety all documents contained in (which obviously includes all referenced documents, etc. as well as any and all court session transcripts (both in audio and written form)) the RI Superior Court Case #P2-2023-3243A, Massachusetts Supreme Judicial Court Case #SJC-13871, U.S. District Court for RI Case #1:25-cv-00677, SCOTUS Cases #24-614, 24-1000, 25-148/25-154, 25-1394 as well as any and all related/referenced cases.

221. Exhibits attached hereto are (which Prete incorporates by reference in their entirety (which obviously includes all referenced documents, etc.)):

-USDCRIMPC1-Prosecution's Exhibit #11 (8/3/23) (1 page)

-USDCRIMPC2-Prosecution's Exhibit #10 (8/1/23) (2 pages)

-USDCRIMPC3-Prosecution's Exhibit #7 (8/1/23) (1 page)

-USDCRIMPC4-Pages 1, 70, and 78 of USSS's Fiscal Year 2023 FOIA Log (3 pages)

-USDCRIMPC5-USSS's first FOIA e-mail letter to Appellant (8/24/23) (2 pages)

-USDCRIMPC6-USSS FOIA Officer Kevin Tyrrell's e-mail to Appellant (8/25/23) (1 page)

-USDCRIMPC7-USSS's second FOIA e-mail letter to Appellant (8/31/23) (2 pages)

**RICO STATEMENT**

Culpable Persons: The above-named Defendants are the persons involved in the criminal Enterprise.

Enterprise: All individuals and entities form a separate and distinct Association-in-fact Enterprise.

Interstate Commerce: Among other things, the Defendants' use of banking systems and repeated use of mail and wire to achieve their criminal scheme effects interstate commerce.

Pattern of Racketeering: All willfully committed predicate acts (18 USC §1962(c)) and acts facilitating, in furtherance of, interrelated with such predicate acts (18 USC §1962(d)) have the same purpose/result and ultimately aggregate to form a single unlawful purpose of taking down the same victim (Prete). Moreover, not only are the predicate acts and acts facilitating, in furtherance of, interrelated with such predicate acts in pursuit of the aggregated single unlawful purpose repeated and unrelenting, the acts are ongoing (e.g. there is a looming kidnapping, etc. of Prete).

Racketeering Activity:

In addition to frequent mail and/or wire fraud (the extent to which are currently unknown to Prete because such evidence is being illegally withheld by defendants) (e.g. defendant Richard St. Sauveur unintentionally revealed that Mark Benjamin e-mailed St. Sauveur to instruct St. Sauveur not to comply with RI Public Record Law to withhold from Prete evidence of the criminal conspiracy against Prete) among the various criminal conspiracies required to maintain the aggregate conspiracy against Prete, racketeering activity includes:

222. Bank Fraud (18 USC §1344): On 7/25/23, SPD and Santander employees conspired to obtain Prete's GENUINE cash from Santander's custody upon the knowingly false pretense that they were counterfeit.

223. Bank Fraud (18 USC §1344): On 7/25/23, SPD and Santander employees conspired to attempt to obtain Prete's family's checks from Santander's custody upon knowingly false pretenses (e.g. check fraud, etc.).

224. Wire Fraud (18 USC §1343): On 7/25/23, through the repeated use of radio communications, SPD coordinated, etc. the set-up of Prete, kidnapping of Prete, destruction of evidence, etc.

225. Witness Tampering (18 USC §1512(b)): On 7/25/23, SPD Officer Brendan McDonald walked into Santander Bank and, despite no one from Santander having called SPD (as acknowledged in SPD's police report) and despite a Santander employee informing and making expressly clear to McDonald that there were no issues of any kind (as admitted in SPD's police report) and the employee's statements were made freely and without any duress, etc. (as demonstrated by the care-free atmosphere of all employees and customers) (stated differently, no probable cause, etc.), as seen on Santander surveillance, McDonald began immediately instructing UFE so SPD could arrest Prete.

Upon receipt/speaking to SPD, UFE is seen, AFTER McDonald LEFT SANTANDER, acting on McDonald's instructions (with paper in-hand (exculpatory evidence, since destroyed)) leading to Prete's false arrest. UFE acted on McDonald's instructions. Shortly after, UFE walked outside the building to where she knew McDonald would be waiting for her to meet back and falsely accuse Prete of allegedly passing two counterfeit bills.

226. Attempted Destruction of Evidence (18 USC §1512(c)): On 7/25/23, instead of stopping sexual assaults being committed by a fellow SPD Officer against Prete, Investigator John Beausoleil grabbed Prete's recording device (which, in no way was interfering with, impeding, etc. any officer's actions, etc.) and immediately proceeded to shut it off. Investigator Beausoleil did not ask permission to shut off the recording device and Prete did not give permission for the recording device to be stopped, shut off, etc. Beausoleil turned the recording device power off. Investigator Beausoleil did not attempt to save (preserve) the in-progress recording nor did Beausoleil ask how to save (preserve) the in-progress recording. As Investigator Beausoleil knew and premeditatively planned, suddenly turning off the power would highly likely result in NOTHING being saved from the in-progress recording (in other words destroying evidence and future evidence).

227. Destruction of Evidence (18 USC §1512(c)): On 7/25/23, Investigator Beausoleil's unapproved above referenced shut off of Prete's recording device destroyed Prete's ability to record the events that unfolded (including, but not limited to, exculpatory statements made by SPD).

228. Attempted Destruction of Evidence (18 USC §1512(c)): On 7/25/23, Santander surveillance footage shows that once SPD learned that Prete was recording them, they swiftly went to verify if there were any other ongoing recordings. Nobody asked

permission to shut off Prete's recording device nor did Prete give permission. The officers did not attempt to save (preserve) the in-progress recording nor did they ask how to save (preserve) the in-progress recording. The officers took out the batteries to the recorder (while the recording was in progress). As these officers knew and premeditatively planned, a sudden loss of power (taking out the batteries) would ensure NOTHING would be saved from the in-progress recording (in other words destroying evidence and future evidence).

229. Destruction of Evidence (18 USC §1512(c)): On 7/25/23, Investigator Beausoleil's unapproved above referenced shut off of Prete's recording device destroyed Prete's ability to record the events that unfolded (including, but not limited to, exculpatory statements made by SPD).

230. Destruction of Evidence (18 USC §1512(c)): On 7/25/23, as seen on Santander surveillance, Pacheco had (voluntarily) provided Prete with photocopies of the front and back of both of Prete's bills. As seen on Santander surveillance, SPD is seen confiscating Prete's photocopies and leaving Santander with them in-hand. SPD later destroyed Prete's photocopies (as demonstrated by SPD's Seizure Report not listing the photocopies (but taking the time to inventory a Voided check from Prete's bank account), Prete's e-mail to SPD requesting return of his property (among which included the photocopies) and SPD Chief not acknowledging they even existed, etc.).

231. Wire Fraud (18 USC §1343): On 7/25/23, Santander employees (Ann Pacheco and an unidentified male) located within Santander Bank conspired to not use Santander phones (knowing such would be subject to discovery) to communicate regarding Prete's arrest and instead, using a personal cell phone, called someone regarding Prete's arrest.

232. Kidnapping: On 7/25/23, with no probable cause for an arrest, with no evidence a crime had been committed, while refusing to inspect the GENUINE bills, while knowing (and admitting) the bills were GENUINE, SPD took Prete, against his will and without his consent, out of the building, into a police car and transported Prete to SPD whereupon Prete was placed into a cell and held against his will and without his consent.

233. Witness Tampering (18 USC §1512(b)): On 7/25/23, at the direction of Michael McCoy, etc., Ann Pacheco was coached, etc. what to write down in her witness statement (including leaving out obvious important exculpatory facts (evidence demonstrating Prete didn't commit any crime)).

234. Witness Tampering (18 USC §1512(b)): On 7/25/23, at the direction of Michael McCoy, etc., Michele Jordan was coached, etc. what to write down in her witness statement (including leaving out obvious important exculpatory facts (evidence demonstrating Prete didn't commit any crime)).

235. Alteration of Evidence (18 USC §1512(c)): To ensure there was no documentation demonstrating the existence of the photocopies, SPD never provided Prete with a listing of his Property. Instead, as shown in "Exhibit 14" of the Prosecution's Information Charging Package, SPD falsified documentation claiming Prete "Refused to sign" a listing of his alleged "Property." As Prete's filings have stated:

> "If [SPD] would have presented the Defendant with that form, the Defendant would have written on the document stating things like the copies of each bill Santander made and provided the Defendant (four (4) pages total (front and back of each bill)) were confiscated by Police and not declared and returned. Among other things, the

SPD premeditatively, etc. falsified documents, defamed the Defendant, etc." (No Emphasis Added).

To date, SPD, Prosecution, etc. refuse to produce SPD's police station surveillance footage (despite Prete's repeated requests). The police station footage would show, among other things, the above referenced document was NEVER presented to Prete.

236. Inducement of Destruction of Evidence (18 USC §1512(b)): Despite Pacheco's witness statement demonstrating that she informed SPD that she had prepared a report compiling identifying information (which included identification of the bills, statements made by Prete, etc.) relevant to any subsequent SPD investigation, legal proceedings, etc., **SPD effectively instructed Santander to destroy (and Santander has confirmed it did destroy) Santander's records of the serial numbers of Prete's bills, etc.**

237. Inducement of Destruction of Evidence (18 USC §1512(b)): SPD only obtained select Santander surveillance footage. Among other issues, Santander's ATM footage (showing, among other things, McDonald's sexual assaults) were not placed into the file, camera angles missing, there's no audio to any of the footage placed into the file (recall, SPD illegally shut off both of Prete's recording devices (and attempted to destroy Prete's existing recordings)), Santander's surveillance footage is CUT OFF immediately before SPD obtained coerced false Witness Statements AND before SPD took custody of the bills, etc. Knowing that surveillance footage is only preserved for a short period of time (after which point, footage is routinely destroyed), SPD induced Santander and its employees to destroy all other footage, audio, etc. despite knowing such evidence was relevant to any subsequent investigation, legal proceedings, etc.

238. Attempted Destruction of Evidence (18 USC §1512(c)): As stated above, by inducing Santander and its employees to destroy all other footage, audio, etc., SPD attempted to destroy evidence (including exculpatory evidence) that was relevant to any subsequent investigation, legal proceedings, etc.

239. Inducement of Destruction of Evidence (18 USC §1512(b)): On 7/26/23, Santander's CEO (Timothy Wennes) and General Counsel (Head Lawyer) (Brian Yoshida) tried to ignore Prete's e-mailed evidence Preservation (Legal) Notice. Knowing that surveillance footage is only preserved for a short period of time (after which point, footage is routinely destroyed), Santander's CEO and Head Lawyer induced Santander and its employees to destroy all other footage, audio, etc. despite knowing such evidence was relevant to any subsequent investigation, legal proceedings, etc.

240. Attempted Destruction of Evidence (18 USC §1512(c)): As stated above, by inducing Santander and its employees to destroy all other footage, audio, etc., Santander's CEO and Head Lawyer attempted to destroy evidence (including exculpatory evidence) that was relevant to any subsequent investigation, legal proceedings, etc.

241. Wire Fraud (18 USC §1343): On 7/27/23 at 4:31PM, Robert Bailey (Santander "Head of US Litigation, Enforcement and HR Law" and seasoned lawyer of over 30 years), speaking on behalf of Timothy Wennes, Brian Yoshida, and Santander, e-mailed Prete claiming Santander didn't know what Prete was referring to and Prete's Preservation Notices were, therefore, unsupported (in other words, they would not preserve the videos, etc., etc., etc.)

242. Inducement of Destruction of Evidence (18 USC §1512(b)): On 7/27/23, knowing that surveillance footage is only preserved for a short period of time (after which point,

footage is routinely destroyed), Bailey, Wennes, Yoshida, etc. induced Santander and its employees to destroy all other footage, audio, etc. despite knowing such evidence was relevant to any subsequent investigation, legal proceedings, etc.

243. Attempted Destruction of Evidence (18 USC §1512(c)): As stated above, by inducing Santander and its employees to destroy all other footage, audio, etc., Bailey, Wennes, Yoshida, etc. attempted to destroy evidence (including exculpatory evidence) that was relevant to any subsequent investigation, legal proceedings, etc.

244. Wire Fraud (18 USC §1343): On 7/31/23 at 12:33PM, because Prete provided even more specifics (thus forcing Santander to admit the existence of the incident), Bailey, speaking on behalf of Timothy Wennes, Brian Yoshida, and Santander, finally acknowledged the existence of the incident but refused to provide any information including the name of the bank manager (who would have direct access to the relevant evidence to preserve).

245. Concealment of Records (18 USC §1512(c)): On 8/1/23 at 3:10PM, in response to Prete's APRA Request, other than a redacted portion of the arrest report and redacted portion of dispatch log, SPD Police Chief Richard St. Sauveur denied Prete to ALL other documents, etc. (including Prete's requested mug shot, list of SPD employees, etc.) claiming there was ongoing investigation.

246. Wire Fraud (18 USC §1343): St. Sauveur's 8/1/23 records concealment was communicated via e-mail.

247. Induced Fraud (18 USC §1512(b)): To support Sauveur's wire fraud, Sauveur instructed SPD Detective Lieutenant Douglas S. Cerce Jr. to criminally forge a USSS "COUNTERFEIT SUBMISSION REPORT" (No Emphasis Added).

248. Evidence Tampering (18 USC §1512(c)): On 8/1/23 at **3:50PM**, SPD Detective Lieutenant Cerce Jr. entered into the record a signed statement knowingly falsely claiming (in full):

> "A submission to the United States Secret Service US Dollars website was made for the 2 **SUSPECTED** counterfeit notes. Submission 111-2023-000321-W was made via the USSS portal." (Emphasis Added).

249. Wire Fraud (18 USC §1343): Cerce Jr. knowingly falsely claimed he used the internet to make a submission on the USSS website.

250. Mail Fraud (18 USC §1341): SPD falsely claims to have, on or around 8/1/23, used the U.S. Postal Service or a private interstate carrier to transport the bills from SPD to Washington, D.C.

251. Mail/Wire Fraud (18 USC §1341/18 USC §1343): Between 8/1/23 and 8/3/23, the bills are falsely claimed to have been transported/transmitted back from Washington, D.C. to Providence, RI.

252. Mail/Wire Fraud (18 USC §1341/18 USC §1343): Between 8/1/23 and 8/3/23, the bills are falsely claimed to have been received by a Secret Service agent in Providence, RI.

253. Victim Intimidation (18 USC §1512(b)): On 8/2/23, Prete unexpectedly obtained the name and e-mail address of the Smithfield Santander Branch Manager (Jeffrey Reilley). On 8/3/23, Prete e-mailed Reilley a preservation notice (to preserve everything related to the Santander incident). On Friday, 8/4/23 at 3:46PM, Santander attorney Bailey (speaking on behalf of Timothy Wennes, Brian Yoshida, and Santander) (who had already attempted to ensure evidence was destroyed), e-mailed Prete threatening that if

Prete continued to e-mail Santander employees (who were in possession of, with control over, etc. evidence relevant to a subsequent legal proceeding), Santander employees and/or Santander organization would, among other things, submit a frivolous ethics complaint against Prete's law license(s).

254. Wire Fraud (18 USC §1343): Bailey's, etc. above threat was issued via e-mail.

255. Induced Fraud (18 USC §1512(b)): To conceal previous predicate acts, etc., an unsigned, unsworn, etc. "Affidavit" dated 8/3/23 is forged.

256. Extortion: On Friday, 8/4/23 at 11:51AM, Benjamin e-mailed Prete stating that unless Prete provided him with irrelevant information, Benjamin would not provide Prete with publicly available records. On 8/4/23 at 1:19PM, Prete e-mailed Benjamin (cc'ing Neronha, Dambruch, and Urso) complying with Benjamin's extortion and noting the extortionary nature of the e-mail. Benjamin not only didn't provide the publicly available records, etc., Benjamin ceased communications with Prete.

257. Wire Fraud (18 USC §1343): Benjamin's extortion was communicated via e-mail.

258. Concealment of Records (18 USC §1512(c)): To protect Passacantilli, Lieutenant Robert Barber, on 8/7/23, via e-mail, denied Prete access to documents, footage, etc. knowingly falsely claiming to do so would be an unwarranted invasion of privacy (note, Prete was the victim, nearly all of Jacome's body cam footage consists of speaking to Prete (on Prete's property), etc.).

259. Induced Concealment (18 USC §1512(b)): Barber's denial was made as part of NPD's custom and practice (ordered/approved by NPD Chief Sean Corrigan) to always claim that reasoning (whether applicable or not) to prevent records disclosure.

260. Wire Fraud (18 USC §1343): Barber's concealment was communicated via e-mail.

261. Given the ongoing nature of the criminal enterprise, this filing is effectively being submitted in emergency fashion. Prete incorporates by reference in their entirety all documents contained in (which obviously includes all referenced documents, etc. as well as any and all court session transcripts (both in audio and written form)) the RI Superior Court Case #P2-2023-3243A, Massachusetts Supreme Judicial Court Case #SJC-13871, U.S. District Court for RI Case #1:25-cv-00677, SCOTUS Cases #24-614, 24-1000, 25-148/25-154, 25-1394 as well as any and all related/referenced cases.

262. Induced Fraud (18 USC §1512(b)): On 9/11/23, to attempt to fraudulently nullify Prete's e-mail, conceal previous predicate acts, etc., Mark Benjamin sought out SPD Captain Cory Carpenter to suborn perjury.

263. Wire Fraud (18 USC §1343): Between 9/11/23 and 9/26/23, member(s) of the RI AG's Office blocked Prete's e-mail address from being able to contact, among others, the RI Open Government Division AFTER Prete had submitted a Public Records Request.

Injury:

In addition to the expenses, damages, physical, emotional, mental suffering, etc. as direct result of the predicate acts, Prete has suffered injury to his reputation (both personally and professionally), his pristine attorney ethics records, his pristine no-criminal record, his pristine no-arrest record, etc., etc.

**VIOLATIONS of RICO 18 USC §1962(c)**

264. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

265. The Defendants are associated with a criminal enterprise whose activities affect interstate commerce.

266. The Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the above stated unlawful purpose.

267. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts.

268. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 USC §1961.

269. The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 USC §1962(c).

270. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 USC §1962(c), Plaintiff has been injured in his business and property as stated above.

**VIOLATIONS OF RICO 18 USC §1962(d).**

271. Prete incorporates by reference Paragraphs 1 through 270, as if fully set forth herein.

272. As set forth above, the Defendants agreed and conspired to violate 18 USC §1962(c).

273. The Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 USC §1962(c), in violation of 18 USC §1962(d).

274. As direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 USC §1962(d), Plaintiff has been injured in his business and property in as stated above.

**VIOLATIONS of State RICO RIGL §7-15-1, et. seq.**

275. Prete incorporates by reference Paragraphs 1 through 274, as if fully set forth herein.

**VIOLATIONS of 42 USC §1983 (FIRST AMENDMENT RIGHT TO FREE SPEECH)**

276. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

277. The First Amendment to the U.S. Constitution, as applied to the States via the Fourteenth Amendment, prevents Defendants from retaliating against Prete's Free Speech.

278. Defendants' actions, as set forth above, retaliate against Prete explicitly because of and based on Prete's Free Speech.

**VIOLATIONS of 42 USC §1983 (FOURTH AMENDMENT RIGHT AGAINST SEARCHES)**

279. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

280. The Fourth Amendment to the U.S. Constitution, as applied to the States via the Fourteenth Amendment, prevents Defendants from conducting warrantless, unjustified, etc. searches to Prete's person and property.

281. Defendants' actions, as set forth above, conducted warrantless, unjustified, etc. searches to Prete's person and property.

**VIOLATIONS of 42 USC §1983 (FOURTH AMENDMENT RIGHT AGAINST SEIZIURE)**

282. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

283. The Fourth Amendment to the U.S. Constitution, as applied to the States via the Fourteenth Amendment, prevents Defendants from conducting warrantless, unjustified, etc. seizure of Prete's person and property.

284. Defendants' actions, as set forth above, conducted warrantless, unjustified, etc. seizures of Prete's person and property.

**VIOLATIONS of 42 USC §1983 (FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS)**

285. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

286. The substantive component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, as applied to the States via the Fourteenth Amendment, protects Prete's Liberty Interests. Prete has a substantive liberty interest in being free from detainment/restraint.

287. Defendants' actions, as set forth above, have infringed upon Prete's substantive liberty interest in being free from detainment/restraint.

**VIOLATIONS of 42 USC §1983 (FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS)**

288. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

289. The procedural component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, as applied to the States via the Fourteenth Amendment, prevents Defendants from depriving Prete of Liberty without procedural protections.

290. Defendants' actions, as set forth above, have deprived Prete of his freedom from detainment/restraint. Defendants submitted knowingly forged documents, committed federal

felony crimes, knowingly and intentionally withheld (and continues to withhold) exculpatory evidence, illegally ordered police not to comply with RI Law, etc., etc., etc.

**VIOLATIONS of 42 USC §1983 (EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT)**

291. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

292. The Eighth Amendment to the U.S. Constitution, as applied to the States via the Fourteenth Amendment, prevents Defendants from inflicting cruel and unusual punishment.

293. Defendants' actions, as set forth above, conducted excessive force, cruel and unusual punishment, etc.

**VIOLATIONS of 42 USC §1983 (FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION)**

294. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

295. The Fourteenth Amendment to the U.S. Constitution, prevents protects Prete's equal protection under the law.

296. Defendants' actions, as set forth above, conducted discriminatory treatment in violation fo Prete's equal protection treatment.

**VIOLATION 42 USC §1985(3) (CONSPIRACY AGAINST RIGHTS)**

297. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

298. Multiple individual conspiracies were executed as part of a single larger conspiracy against Prete.

299. The conspiracies were meant to deprive Prete (a federally protected class of one) of his legal protections, privileges, etc.

300. Each conspirator acted in furtherance of the conspiracy.

301. As a result of the conspiracies, Prete suffered personal injury, property damages and deprivations of rights, etc.

**VIOLATION 42 USC §1986 (CONSPIRACY AGAINST RIGHTS)**

302. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

303. Multiple state actors had knowledge of previous and ongoing conspiracies actionable under §1985 and not only didn't prevent such violations, etc. but willfully participated in such conspiracies.

**VIOLATION OF RI PUBLIC RECORDS ACT RIGL §38-2-1, et seq.**

304. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

305. Without legitimate justifications and in violation of RI General Laws, various state agencies denied Prete access to documents, etc. to conceal evidence of conspiracies against Prete.

**ASSAULT**

306. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**BATTERY**

307. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**FALSE ARREST**

308. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**FALSE IMPRISONMENT**

309. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**DEFAMATIONS**

310. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**LIBELS PER SE**

311. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**INVASION OF PRIVACY**

312. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**TRESPASS TO CHATTELS**

313. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**CONVERSION**

314. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

315. Prete incorporates by reference Paragraphs 1 through 263, as if fully set forth herein.

**RELIEF REQUESTED**

Prete requests this Court enter judgment against the Defendants and grant the following relief:

I. Declaration that Defendants have violated Prete's Constitutional rights.

II. Award Prete actual damages, treble damages, punitive damages, expenses, etc. and any other relief.

PLAINTIFF DEMANDS TRIAL BY JURY.

/s/ Michael Prete
Michael Prete
782 Boston Neck Road, Narragansett, RI 02882
July 21, 2026